v. United States of America, United States of America, United States of America, United States of America, United States of America, United States of America, United States of America v. United States of America, United States of America, United States of America, Mr. Bragdell, don't let me take up too much of your time here, but I want to start with a fun question, which is, the CIT made a non-market economy determination. Do you agree with the finding, was it appropriate or not? And you can do that briefly. Your Honor, we agree that China is a non-market economy, was in this case and remains a non-market economy. Yes, Your Honor. May it please the Court, Tim Bragdell, Wiley Ryan on behalf of Solar World Americas. Commerce has made two decisions with respect to factors of production in this case. Both are unsupported by substantial evidence, and in fact, they're flatly contradicted by compelling record evidence, and as a result, the anti-dumping margin is not calculated as accurately as possible. At JA4, the CIT said you also challenged Commerce's surrogate financial ratio calculation, including a certain of Suntec's sales, made to an affiliate, and use of factor. Have you abandoned those arguments on appeal? Yes, Your Honor, we're only challenging these two surrogate value issues, given our... It's purely a housekeeping question. I want to know how narrow we are. Okay. Absolutely. Thank you. These surrogate values are particularly important for a product such as solar panels, a high-cost technology using cutting-edge manufacturing inputs. A mistake in valuing the components means that the product will be substantially misvalued in the anti-dumping calculation. In the blue brief at 17, you argue that Commerce is, I'm quoting you, is required to abide by the statutory provisions of HCSUS, and that Commerce's failure to do so renders this case contrary... It renders its determination contrary to law. What authority supports the position that Commerce is bound by these provisions? I mean, number one, you sort of back away from that within your brief, and number two, in Downhole Pike, we explain that Commerce is not required to engage in classification. Why doesn't Downhole Pike foreclose your arguments? Your Honor, what the statute says is that the provisions of the Harmonized Tariff Schedule shall be considered to be statutory provisions of law for all purposes. So you're right. I find that language clear. We're not arguing that... You can't have it both ways. Well, we're just saying for this particular case, those HTS provisions and the definition of a profile have to be guide Commerce's decision as to what is the most appropriate... And when you say have to, you mean that Downhole Pike doesn't apply? No, Your Honor. What I'm saying... I mean, what we're arguing is there was not substantial evidence here that the decisions were unreasonable. We're not saying that the HTS dictates, but we're saying that the definition in the Harmonized Tariff Schedule is such compelling evidence, among with the other forms of evidence, that there isn't substantial evidence to support what Commerce did in this case. So Commerce does have discretion in the selection of surrogate values, but it has to calculate the dumping margin as accurately as possible. So we have the... Okay. At page 18... Yes, Your Honor. You've criticized Commerce for rejecting your argument about the presence of corners in Ying Lee's aluminum frames as speculation. Yes. But then you say, casting, centering, and further working profiles do not necessarily involve altering the cross-section of the profile. So aren't you also relying on speculation when you say, not necessarily? Well, Your Honor... And why are the presence of some corners different? We know for these products, for solar aluminum frames, that they are not... They do not have a uniform cross-section along their entire length because of the corners. We know from the evidence that is on the record from the photographs that these do not meet the definition of a profile. And... You say in there that the processing steps to manufacture Ying Lee's aluminum frames, quote, are performed by different companies and add significant value. Where's the support for that in the record? I couldn't find it. Your Honor, I believe... I believe Ying Lee made those points in its questionnaire responses. So I'm looking at pages 18 and 19 of our brief that cite the Ying Lee questionnaire response. I don't have the appendix open. I can double-check, but it's the appendix... Do that when you're sitting down, then. All right. Thank you. So these frames are not uniform along their entire length. So you have that conflict with the harmonized tariff schedule. They're converted from profiles. And Commerce is... It needs to follow these definitions, which it did not in this case, despite acknowledging the distance of the corners. Meanwhile, while the definition does allow for some further working of the profile, the processing cannot be so extensive as to result in the profile assuming the character of an article or a product of other headings. And the information submitted by Ying Lee, which is business proprietary, shows the detailed production process steps that make these aluminum frames a finished product, not a semi-finished product. It's clear evidence on the record to select a surrogate value for aluminum frames came from the tie HDS heading. Even if Ying Lee's frames are slightly more processed, why does that demonstrate that tie-heading 7616 is more appropriate than tie-heading 7604? Well, I think the most compelling evidence on that, Your Honor, is the two customs rulings that classify these frames under 761699. And again, you're just going to tell me, when I say, are they binding, you're going to say, no, it's just evidence. It's unusually persuasive evidence, because the first one... Both of these... Well, you find it unusually persuasive, Mr. Mayfield. I'm sorry, Your Honor? You find it unusually persuasive. I mean, I think everybody would agree it's evidence. When a Chinese company requests for a classification of an aluminum solar frame, and Customs and Border Protection issues two rulings, and in both cases they say it's a more advanced product, it's either 761699, or it's even more advanced, which would be 854190, they've twice concluded that HDS 7604 was inappropriate for aluminum frames, and that the heading reflected that a more sophisticated product was required. That's why we called it uniquely dispositive evidence of the correct classification. Now, Commerce also claimed that 761699 is a basket category, but that basket category includes finished goods, not semi-finished goods. In a profile, under 7604 is a semi-finished goods. You deal with steel products all the time. It would be like using a classification for a steel billet instead of a finished steel product. Speaking of such things, would you address the semi-finished polysilicon ingots and blobs? In the blueprint at 29, you argue Commerce, I'm putting in the word Commerce, could have used a different methodology to calculate a surrogate value for semi-finished polysilicon inputs by taking the price of raw polysilicon and adjusting it based on Ying Lee's production process. What precedent supports the proposition that Commerce was required to employ a different methodology? Do you argue that it was an unreasonable application of the statute? Your Honor, I would say the authority is, if you look at the Jinan Yipin case of the Court of International Trade, Commerce cannot select a surrogate value by default. And here, they selected a surrogate value by default. Well, they rejected your methodology because, I'm quoting, a respondent's market economy purchase prices are proprietary information, i.e. not publicly available and not necessarily representative in this industry-wide price is available. Why doesn't that constitute a reason and explanation for what they did as opposed to what you wanted them to do? Well, we offered several alternatives for what they could have done, and we understand that the market prices were business proprietary, although they do show that the actual pricing of these products is several times greater than the value that was used for the raw material. But there were other methods that Commerce also could have done, which was to take the polysilicon value and increase it for all of the additional materials used in turning the polysilicon rock into a finished crystal that can be then made into a solar wafer. But you're asking Commerce to disregard normal methodology, right? So don't you bear the burden? We felt like we met the burden by showing the disparity and by the fact that they, again, used a raw material value to value a more finished product. What about where they said they accounted for the cost of the additional processing required from a manufacturer that emits in blocks? Your Honor, they said that it was accounted for in the company's overhead, but there's no dispute that there are additional manufacturing inputs when you take the polysilicon rocks and melt them into an ingot. You add additional inputs as well, and Commerce's regular methodology is to account for any input introduced into the manufacturing process at any step. So they don't call it just overhead. They would attach a surrogate value to every input added in, and they failed to do that in this case. Again, this would be like using scrap or iron ore to value a steel billet, which is inappropriate. It's never accurate to value a manufacturing input using a raw material surrogate value. Unless there are other questions, I'll hold some time for rebuttal. Okay, we'll save you rebuttal time. Thank you. Thank you. Would you like any time, Joris Hogan? Good morning, Your Honors. May it please the Court. Okay. SolarWorld's arguments do not show that... In the blue brief at 29... It's nice to see everybody again. In the blue brief at 29, SolarWorld argues Commerce could have used a methodology in which it started with the price of raw polysilicon and adjusted it based on Ingley's production process, which Mr. Breitgold was just addressing. Are you aware of any instance in which Commerce has employed a methodology similar to that requested by SolarWorld, and under what circumstances? I am not aware of any circumstance in which Commerce has done that. Nonetheless, Commerce still entertained the argument that SolarWorld made and found that on the record of these facts, there wasn't any reason to depart from its usual practice. Commerce doesn't abuse its discretion when it declines to adopt an alternate methodology and follows its normal practice. So we're not aware of any situation, but Commerce did, and explained why, particularly on the facts of this case, where actually most of the ingots and blocks that were consumed by Ingley were self-produced. It made sense that those manufacturing costs... I mean, the Court can look at the proprietary... I think it's on page 24 of the Ingley's brief. It's a very small percentage of the ingots and blocks that were purchased, as opposed to self-produced. So particularly in that circumstance, it seems reasonable that the normal manufacturing overhead that was already accounted for in the factory production build-up could reasonably serve. And Commerce acknowledged this is an imperfect fit, but that's okay, given what limited available information was on the record, and neither party... Do I remember correctly that neither party provided any other surrogate value approximation? That is correct, Your Honor, and that is why Commerce used the world market value for polysilicon. Neither party suggested that there was an alternate surrogate value for ingots and blocks. Certainly had that been on the record, Commerce would have been obligated to consider that, but given that there was essentially an absence of information to value that particular factor, Commerce went with what was on the record and found that that was reasonable given the circumstances that we have here. But even an imperfect choice does not mean that the decision is not supported by substantial evidence. And similarly with the aluminum frames, Commerce's decision that 7604, representing aluminum rods and profiles, even if SolarWorld is correct that frames cannot be classified for tariff purposes under that HTS category, that doesn't mean that Commerce's determination that that was more similar than the basket category that contained nails and knitting needles and bodkins and all number of other disparate products, that that was not the better choice. And we think that is certainly one of those quintessential surrogate value determinations that Commerce makes. And its reasoning is sound and it's a reasoning that has been consistent in how Commerce has treated aluminum frames in both the solar cell and the solar product proceedings. And so for those reasons, we would respectfully request that the Court... Don't sit down yet. Okay. I probably shouldn't even ask the government whether it agrees with the NME determination because of course it made it. But do you have any comment on that? Because I'm going to ask you later. I don't have any comment on that. The particular party who made that challenge before the CIT did not appeal that determination. So we would certainly believe that the trade court reached their correct decision on that. Thank you. Thank you. I see you sharing your time with Mr. Higgins. So, Mr. Higgins, address my housekeeping question first. At JA-13, the CIT made a determination on the continuing viability of NME status. Do you take issue with that finding? For purposes of this case, no. Okay. Go ahead. I think I'm content to rest on the briefs Do you have any particular questions? In the red brief at 17, you argue that the picture on the record of the cross-section of Ying Lee's aluminum frame showed that it's uniform across its entire length. And you cite to JA-20124-25, which is a transcript of the CIT proceeding. You recognize that that's not record evidence before Congress and we can't base a substantial evidence analysis on that. That's correct. That's correct. You also cite to 2663, which is a picture. But how do we know from that picture that the cross-section is uniform? And you have the presence of a corner, but does that necessarily mean that the cross-section is not uniform? I think the definition of uniform cross-section is not clear based on the record evidence. However, these frames, after the processing, they do not waver. They are straight. They are very similar to profiles. They're much more similar to a profile that's described in HDS-7604 than they are to the random grab bag of items that are found in 7616. I sort of got an effectively uniform flavor out of it. Right, right, right, yeah. They're certainly very different from the random products that are found in the HDS code suggested by the appellant, including vodkins, aluminum wire, staples, tacks, those sorts of things. Those certainly are not Ying Lee's frames. Thank you. Thank you. Thank you. Thank you, Mr. Higgins. Mr. Brightfield. Your Honors, I wanted to return to one other point on the aluminum frames, which is that we also have a failure of commerce to consider an important aspect of the problem here, evidence that the traffic... Failure to consider important evidence detracting from their decision, which were the multiple customs rulings classifying unfinished aluminum articles under HDS-7604, the profile heading. And in fact, commerce said, this question is not relevant to our decision. We strongly disagree. It's extremely relevant. And again, there were three decisions that addressed products that were profiles and aluminum profiles and all found that these were properly classified under 7604, that these were unfinished articles, not finished articles, and therefore they should be classified in that 7604 category. So commerce, at the very least, needed to consider that evidence and particularly when the courts have said that product specificity is important and that these are specific rulings addressing the exact products that commerce is trying to consider as part of its determination. With regard to counsel's argument as far as which product is more similar, again, I would just point out that all of the items in Category 7616 are finished articles. We understand it's a wide variety of things, but they're all finished goods. And instead, commerce chose to value this as an unfinished profile, which substantially undervalues that product. Who would not his quietest with a beer bot can make? It's Your Honor. On ingots and blocks, I would just point out, Your Honor asked if there was any other alternative on the record. We did explain how commerce could have done the calculation. We didn't provide the calculation itself. We explained how commerce could have done it. We gave them a roadmap to do it. You gave a methodology which I heard the government to say had never actually dictated. The government's knowledge had not actually been used before. Is that the methodology you're referring to? Yes. We suggested they could take either the market economy price or the raw material price that they used and adjust it to reflect the fact that it was a much more sophisticated product. Thank you very much. Thank you. The case is taken under submission. Can I just say something? I have to say to the counsel, it's just fun to see everybody from my old home town, so to speak. Thank you. We're glad that we have Judge Wallach now with us.